UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                        Criminal Case No. 22-20068

v.                                   Honorable Linda V. Parker

JAMARRIO DOBBS,

      Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 16]

Defendant Jamarrio Dobbs has been charged with one count of Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1).  The charge arises from a search conducted on Mr. Dobbs' home pursuant to a search warrant on October 21, 2020.  Mr. Dobbs now moves to suppress the narcotics, packaging materials, and the firearm officers uncovered during the search, claiming it was seized in violation of the Fourth Amendment.

## FACTUAL BACKGROUND

According to the Government, Officer Matt Akerley—the Special Agent with the Drug Enforcement Administration ("DEA") who drafted the Affidavit—has over six years' experience with the DEA and prior experience with the Michigan State Police.  (ECF No. 19 at Pg ID 88.)  In addition to his years of

experience, Officer Akerley has also received extensive training including classroom instruction regarding "narcotics, smuggling, money laundering, conspiracy, and complex investigations." (ECF No. 16-2 at Pg ID 65.)

### A.  Months-long Investigation of Mr. Dobbs and Michele Marsh

In August 2020,  the Eastpoint Police Department ("EPD") received information about a woman named Michele Marsh ("Marsh") who was alleged to have been selling crystal methamphetamine, cocaine, and heroin from her home in Eastpointe, Michigan.  Later that month, an undercover officer ("UCO") bought an ounce of crystal meth from Marsh and agreed to come back later for the second ounce.  During the sale negotiations with the UCO, Marsh sent a text to an out-of-state phone number later determined to be affiliated with Mr. Dobbs.  (ECF No. 16-2 at Pg ID 68-69.)  During the conversations between Marsh and the UCO, Marsh conveyed that her narcotics supplier was named "Rio," (believed to be a derivative for Jamarrio) who gets the drugs from out-of-state.  According to phone records obtained by the Government, Mr. Dobbs was speaking with Marsh during the narcotics transaction with the UCO.  (ECF No. 16-2 at Pg ID 69-70.)

In September of 2020, the UCO engaged in a subsequent purchase of crystal meth from Marsh.  During this transaction, Marsh conveyed that she sold 6.5 ounces of meth a week for Rio.  When her cellphone rang, Marsh stated that she

was speaking with her "boss," which phone records indicate Marsh was speaking

with Mr. Dobbs during that time.  (ECF No. 16-2 at Pg ID 70-71.)

On September 10, 2020, Marsh and the UCO continued to negotiate the

narcotics deal.  According to phone records, Mr. Dobbs and Marsh spoke with

each other that day and approximately fifteen minutes later, Mr. Dobbs left his

home in a Toyota RAV-4 with out-of-state plates.  Although the Government

admits to not having surveillance on Mr. Dobbs the entire time once he left his

residence, ECF No. 16-2 at Pg ID 72, he arrives to Marsh's home ten minutes after.

Mr. Dobbs is observed entering Marsh's home and departed approximately twenty

minutes later.  Immediately after Mr. Dobbs left, Marsh contacted the UCO and

notified him that she had the meth ready for him to purchase.  While conducting

surveillance of Marsh's home, officers observed additional "quick traffic at

Marsh's house (indicative of drug dealing)."  (ECF No. 19 at Pg ID 89; ECF No.

16-2 a PG ID 73; ¶ 17.)

During the same day, after the UCO purchased the narcotics, Mr. Dobbs

drove a different vehicle with different out-of-state plates to Marsh's home, went

in for approximately two minutes and drove back in the direction of his home.

However, before Mr. Dobbs arrived back to his home, he was observed "circling a

residential block once, in a manner consistent with counter surveillance."  (ECF

No. 16-2 a PG ID 73; ¶ 19.  In the Affidavit, Officer Akerley notes that it is his

3

belief that Mr. Dobbs "was picking up money from the drug transactions completed by Marsh and transporting it back to his residence. . . ." (*Id.*)

On October 6, 2020, officers observed a man driving a rented SUV who arrived at Mr. Dobbs' home. The man, later identified as C. Turner,[1] walked into Mr. Dobbs' garage and exited less than ten minutes later. Officers observed "several other short stay vehicle traffic" during the rest of the day. (ECF No. 19 at Pg ID 90.)

### B. "Trash Pull" at Mr. Dobbs' Residence

On October 7, 2020, local law enforcement conducted a "Trash Pull," or obtained the trash on the curb of Mr. Dobbs' residence. (*Id.*; ECF No. 16-2 at Pg ID 75, ¶ 22.) Upon inspection of the trash, officers found "a flight ticket with Jamarrio Dobbs name on it, vacuum sealed bags, zip lock bags, clear sandwich bags, and FedEx and USPS bags." (ECF No. 16-2 at Pg ID 75, ¶ 22.). On the same day, officers tested a sample of the residue found in the trash, which tested positive for methamphetamines.

---

[1] Officer Akerley also notes that Mr. Turner was convicted in West Virginia for selling cocaine, was on probation at the time of the surveillance, and had an outstanding warrant for possession of methamphetamines. (ECF No 16-2 at Pg ID 74-75.)

### C.  Continued Investigation of Mr. Dobbs and Marsh

On October 13, 2020,—a week before the search warrant was issued— the UCO made another purchase of narcotics from Marsh.  Marsh conveyed to the UCO that she needed to confirm with her boss that the drugs were available. Twenty minutes later, Marsh conveyed that she would be getting a ride to a gas station to conclude the sale, and eighteen minutes later, a vehicle left Dobbs' home and arrived at Marsh's home.  Marsh entered the vehicle and texted the UCO that she had the narcotics. They met at the gas station as discussed and Marsh sold the drugs to the UCO.  According to phone records obtained throughout the time of the narcotics deal, Marsh and Mr. Dobbs were in contact with each other.

## LEGAL STANDARD

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons … against unreasonable searches and seizures."  U.S. Const. amend. IV.  "One of the touchstones of the reasonableness requirement is that the police must generally obtain a warrant based upon a judicial determination of probable cause before entering the home."  *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008).  Courts conclude that a magistrate judge who is tasked with reviewing a search warrant application is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ..., there is a fair probability that contraband or evidence of a crime will be found in a particular

place." *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "There must, in other words, be a *nexus* between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc).

A court charged with reviewing the validity of a search warrant must ensure that the magistrate judge had a "substantial basis for concluding that probable cause existed." *Id*. (quoting *Gates*, 462 U.S. at 214). "The review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit." *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009). Most importantly, a magistrates' decision to grant a warrant will be reversed only if it was arbitrarily exercised. *United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001) (citing *See United States v. Spikes,* 158 F.3d 913, 923 (6th Cir. 1998)).

## ANALYSIS

Mr. Dobbs seeks to exclude the evidence obtained from the search of his home arguing that (1) the affidavit did not provide the requisite probable cause, (2) the information that law enforcement relied upon for the warrant was stale, and (3) the good faith exception to the exclusionary rule does not apply.

### A.  Requisite Probable Cause

First, Mr. Dobbs maintains that the affidavit lacked probable cause because the evidence proffered, including the methamphetamine residue found in the trash can and the evidence that Mr. Dobbs was allegedly involved in a "drug conspiracy," amount to mere "inferences."  (ECF No. 16 at Pg ID 53.) Specifically, Mr. Dobbs maintains that the government failed to establish a nexus between Mr. Dobbs' residence and the narcotics found.  *See Brown*, 828 F.3d at 382.

The Court disagrees with both arguments.  The Sixth Circuit is clear that to determine whether probable cause exists in cases involving search warrants for homes allegedly involved in drug trafficking, "the only relevant question is whether the affidavit gave a *reasonable basis* for believing there were drugs or evidence of drug trafficking" at Mr. Dobbs' home.  *United States v. Burney*, 778 F.3d 536, 540 (6th Cir. 2015) (emphasis added); *Gardner v. Evans*, 920 F.3d 1038, 1049 (6th Cir. 2019).  Here, the affidavit does contain sufficient probable cause to conclude that evidence of a crime would be found in Mr. Dobbs' home.  The affidavit begins with describing Officer Akerley's breadth of experience in addition to details of the investigation, including locations, times, and names of individuals involved.  Importantly, the affidavit references Mr. Dobbs being in contact with Marsh during *each* of the transactions with the UCO.  (ECF No. 16-2

at Pg ID 69-71.)  For example, on September 10, phone records indicated that Mr.

Dobbs was in contact with Marsh before officers began surveillance.  Fifteen

minutes later, officers observed Mr. Dobbs arrive at his home and stay for a short

period of time before going to Marsh's home and staying for another brief period.

Immediately after Mr. Dobbs left Marsh's residence, Marsh contacted the UCO

and notified him that she had the drugs to sell.  Later the same day, surveillance

suggests that Mr. Dobbs returned to Marsh's residence ostensibly to retrieve the

proceeds of the earlier sale, but upon his return home, Mr. Dobbs circled around

the block, which Officer Akerley notes is viewed by law enforcement as a "counter

surveillance" tactic.  Further, the affidavit details the surveillance of Dobbs' home,

and the seemingly regular "short stays," combined with the fact that many of the

vehicles driven by Mr. Dobbs and his associates were rentals, which Officer

Akerley explains, "based on his training and experience that drug traffickers often

use rental vehicles and nominees in order to avoid detection by law enforcement

agencies."  (*Id*. at Pg ID 74, ¶ 20.)

Moreover, the Affidavit details the fact that Mr. Dobbs has prior criminal

drug convictions,[2] which courts may rely upon in a determination of probable

---

[2] Officer Akerley discovered that Mr. Dobbs has a history of drug charges, including a 2005 conviction for possession with intent to distribute 50 grams or more of crack, a 2016 conviction of distribution of heroine, and a prior 1998 charge for resisting/obstructing a police officer.  At the time of the Affidavit, Mr. Dobbs was also on federal supervised release.

cause. *See United States v. Dyer*, 580 F.3d 386, 392 (6th Cir. 2009) ("Although a defendant's criminal history is not dispositive, it is relevant to the probable cause inquiry.") (internal citations omitted); *U.S. v. Hines*, 885 F.3d 919 (6th Cir. 2018). Under the totality of the circumstances and in viewing the affidavit in a "commonsense-rather than a hypertechnical-manner," the Court finds that the government proffers more than mere inferences: the evidence does support a finding of probable cause. *See United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004) (citing *Greene,* 250 F.3d at 479 (the court does not need to engage in a "line-by-line scrutiny" of the affidavit but should consider the "totality of the circumstances")).

## B.  "Staleness" of the Evidence

Next, Mr. Dobbs maintains that the information relied upon for the issuance of the warrant is stale.  When the government seeks to establish probable cause to obtain a search warrant, "the affidavit may not employ 'stale' information, and whether information is stale depends on the 'inherent nature of the crime.'" *See United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) (quoting *Spikes,* 158 F.3d at 923).  When the alleged crime involves drugs, the information is deemed to become "stale very quickly 'because drugs are usually sold and consumed in a prompt fashion.'"  *Id*. (quoting *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009).

In support of his argument that the information was stale, Mr. Dobbs notes

that "law enforcement did not seek a search warrant until *thirteen days* after the

trash pull, and *seven days* after the last alleged phone call between Dobbs and

Marsh." (ECF No. 16 at Pg ID 57 (emphasis in original).) However, the

investigation and surveillance of both Mr. Dobbs' and Marsh's homes were still

ongoing, despite the last alleged phone call cited in the affidavit occurring seven

days before its issuance. As this Circuit holds, "[e]vidence of ongoing criminal

activity will generally defeat a claim of staleness." *Greene*, 250 F.3d at 481 (citing

*U.S. v. Canan*, 48 F.3d 954, 958 (concluding that conduct described in the

affidavit, which was more than four years old, was not stale because of its ongoing

nature.). As such, the evidence that the government relied upon in its affidavit—

which included an ongoing investigation—was not stale.

## C. The "Good Faith" Exception

Finally, Mr. Dobbs maintains that the good faith exception to the

exclusionary rule does not apply to law enforcement's alleged violation of his

constitutional rights. Specifically, Mr. Dobbs argues that "the affidavit had no

meat on its bones as to the allegation that contraband would be found *inside*

Dobbs' home." (ECF No. 16 at Pg ID 59 (emphasis in original).) The Supreme

Court created an exception to the exclusionary rule when evidence is "seized in

reasonable, good-faith reliance on a search warrant that is subsequently held to be

defective." *United States v. Leon*, 468 U.S. 897, 905, (1984); *United States v.*

*White*, 874 F.3d 490, 496 (6th Cir. 2017).  To determine whether an officer's

reliance on a search warrant was reasonable, courts have outlined four

circumstances to consider:

> (1) when the warrant is issued on the basis of an affidavit
>    that the affiant knows (or is reckless in not knowing)
>    contains false information;
>
> (2) when the issuing magistrate abandons his neutral and
>    detached role and serves as a rubber stamp for police
>    activities;
>
> (3) when the affidavit is so lacking in indicia of probable
>    cause that a belief in its existence is objectively
>    unreasonable; and,
>
> (4) when the warrant is so facially deficient that it cannot
>    reasonably be presumed to be valid.

*United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (citing *Leon,* 468

U.S. at 914–23).

Here, there is no evidence presented, nor does Mr. Dobbs attempt to argue

that the officers were aware of any false information or that the magistrate judge

did not act in a neutral manner.  *See id*.  Thus, only the last two *Leon* factors

remain.  "Affidavits that are 'so lacking in indicia of probable cause' have come to

be known as 'bare bones' affidavits.  *Id.* (citing cases).  An affidavit is considered

to be "bare bones"  if it merely "states suspicions, beliefs, or conclusions, without

providing some underlying factual circumstances regarding veracity, reliability,

and basis of knowledge." *United States v. McPhearson*, 469 F.3d 518, 526 (6th

Cir. 2006) (quoting *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996.)).

The Affidavit drafted by Officer Akerley is not "bare bones" by any means.

Again, the Affidavit goes into great detail about the investigation, includes phone

records, and a trash pull.  As the court in *United States v. Reed* determined, "[e]ven

if an affidavit describing a suspect's drug activity does not establish a probable-

cause nexus between the place to be searched and the evidence of that activity,"

which this Court concludes that it does, "the affidavit will avoid the bare-bones

label so long as it identifies a 'minimally sufficient' nexus between the two."  993

F.3d 441, 450 (6th Cir. 2021) (a minimally sufficient nexus requires "some

connection, regardless of how remote it may have been—some modicum of

evidence, however slight—between the criminal activity at issue and the place to

be searched.")).  The Affidavit goes well beyond proffering "a modicum of

evidence" due to its thorough descriptions and plethora of detail.

Finally, the government argues, and the Court agrees, that "[g]iven the

comprehensive investigation detailed in the affidavit, it is simply not possible to

conclude that the affidavit was facially lacking, obviously deficient, or that officers

'recklessly relied on the judge's decision that probable cause existed for the

warrant.'"  (ECF No. 19 at Pg ID 96 (quoting *Reed*, 993 F.3d at 450)).  After

assessing the *Leon* factors, the Court finds that the good faith exception would

apply here if the warrant lacked the requisite probable cause, which it does not.

Accordingly,

**IT IS ORDERED** that Defendant's Motion to Suppress (ECF No. 16) is

**DENIED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: March 28, 2023